**IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| Amanda Whatley, SSgt. Joshua Whatley, Leah Fuhrman, PO1 Randy Fuhrman, Stephany Cross, SSgt. Paul Cross, CW4 Robert Domen, Victoria Howe, GySgt. Scott Howe, Jenna Risher, Sgt. Levi Risher, On Behalf of Themselves and All Others Similarly Situated, )))))))) | Case No.: 9:17-cv-02716-DCN |
| Class Plaintiffs, )) | |
| vs. )) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Managing Member, LLC, a/f/k/a Tri-Command Military Housing, LLC, and Atlantic Marine Corps Communities Property Management LLC, ))))))))) | ***(JURY TRIAL DEMANDED)*** |
| Defendants. )) | |

## THE PARTIES

1.     Plaintiffs are military families who leased residential housing at the Laurel Bay housing area ("Laurel Bay") at Marine Corps Air Station Beaufort ("MCAS") in Beaufort, South Carolina, from Defendants.   They bring this action to recover damages for each Plaintiff's and Class Plaintiff's loss of the benefit of his or her bargain resulting from Defendants' nondisclosures of environmental contaminants on the premises he or she leased (the "Premises") which, given Defendants' conclusions and knowledge about resulting health risks, made the Premises worth less than what each Plaintiff or Class Plaintiff paid to Defendants in rent.

- 1 -

2.      Amanda Whatley and Staff Sergeant Joshua Whatley are former tenants of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately 2007 until 2010.

3.      Leah Fuhrman and Petty Officer First Class Randy Fuhrman are former tenants of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately November 2010 until November 2014.

4.      Robert Domen is a former tenant of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately February 2005 until October 2007.

5.      Stephany Cross and Staff Sergeant Paul Cross are former tenants of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately May 2009 until February 2013.

6.      Victoria Howe and Gunnery Sergeant Scott Howe are former tenants of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately June 2003 until December 2006.

7.      Jenna Risher and Sergeant Levi Risher are former tenants of Atlantic Marine Corps Communities, LLC, at Laurel Bay from approximately June 2013 until January 2016. The Rishers resided in the "Laurel Bay" housing area at MCAS.

8.      Defendant Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Military Housing, LLC ("AMCC") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing business in South Carolina .

9.      Tri-Command Managing Member, LLC and Tri-Command Military Housing LLC were Delaware limited liability companies and were the corporate predecessors of AMCC.

Tri-Command Managing Member, LLC and Tri-Command Military Housing LLC were merged out of existence and became AMCC.

10.    Defendant AMCC Property Management, LLC ("AMCC PM") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing business in South Carolina.  AMCC PM acts as AMCC's agent for the lease of residential housing to military families at various locations, including Laurel Bay, during all relevant times and is authorized to manage residential housing at Laurel Bay on AMCC's behalf.

11.    Tri-Command Property Management LLC was a Delaware limited liability company and was the corporate predecessor of AMCC PM.  Tri-Command Property Management LLC was merged out of existence and became AMCC PM.

12.    AMCC and AMCC PM are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Laurel Bay, as well as the conduct and acts alleged herein.

## CLASS ALLEGATIONS

13.    A class action is alleged pursuant to South Carolina Rule of Civil Procedure 23.

14.    Plaintiffs seek to represent a class of persons ("Class") that includes all persons who formerly leased or resided in residential property from AMCC at Laurel Bay in Beaufort, South Carolina.

15.    The Class consists of thousands of former tenants who lived at Laurel Bay.  The Class is therefore so numerous that joinder of all individual Plaintiffs would be impractical.

16.    The Class involves questions of law and fact common to all individual members of the Class, such as whether Defendants engaged in wrongful conduct or practices related to the

lease of residential housing to military families and failed to disclose the risk and presence of toxic pesticides and other contaminants.

17.    The claims and damages sought by the Class are typical of the claims and relief that could be sought by individual members of the class.  Specifically, all members have suffered similar injury and damages as a result of Defendants' wrongful conduct.  The claims and defenses of the Class therefore arise from the same conduct by Defendants and are based on the same legal theories.

18.    Plaintiffs will adequately and fairly represent the interests of individual members of the proposed Class in that they are similarly situated persons who entered leases with Defendants and lived at Laurel Bay and were deprived of the benefits of their lease agreements due to Defendants' non-disclosures and were damaged by Defendants' conduct.

19.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class. Accordingly, a class action under Rule 23 of the South Carolina Rules of Civil Procedure is in the best interests of judicial economy.

## GENERAL AND FACTUAL ALLEGATIONS

20.    In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871, et seq. (1996).

21.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects."  S. Rep. No. 104-112 (1995).

22.     The legislative history reveals that Congress designed MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities as a quid pro quo for their provision of housing and related services to military personnel. 141 Cong. Rec. S18853 (MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel").

23.     The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to initiate housing projects which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances, investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

24.     To accomplish its goals related to the development and management of military housing at the Beaufort MCAS, the Department of the Navy ("DON") entered into a fifty-year lease agreement ("Ground Lease") with Tri Command Managing Member LLC ("TCMM") on March 1, 2003.

25.     Under the Ground Lease, the United States conveyed its rights and interests in the property which is the subject of this action to TCMM for fifty years and, further, conveyed title to all existing personal property (*e.g.,* equipment, appliances, furnishings, etc.) and title to the newly constructed units.

26.     A memorandum of the Ground Lease is publicly recorded with the Register of Deeds for Beaufort County, South Carolina; however, neither the Ground Lease itself nor the multiple exhibits attached to the Ground Lease were publicly recorded.

27.     TCMM, therefore, pursuant to the Ground Lease, obtained control over the renovation, demolition, construction and maintenance of the military housing for Beaufort MCAS, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

28.     Prior to or concurrently with the execution of the Ground Lease, TCMM, as the managing member, and the DON, as an equity investor only, formed a limited liability company called Tri Command Military Housing ("TMH").

29.     As lessee under the Ground Lease, TCMM agreed to assign to TMH all of TCMM's leasehold interests, rights, title and obligations under the Ground Lease, and TMH agreed to assume all financial obligations of TCMM.

30.     Today, TCMM is known as "Atlantic Marine Corps Communities, LLC" ("AMCC"), and TMH is known as "AMCC Property Management, LLC" ("AMCC PM"). AMCC, as managing member of the Company, is responsible for the design, financing, demolition, renovation, ownership, management, operation and maintenance of existing and new housing units.

31.     Under the Ground Lease, the DON provides limited oversight in order to assure contract compliance. The property, therefore, is under the control of AMCC PM and under the direction of AMCC, the managing member.

32.    Prior to executing the Ground Lease, the Government commissioned an "Environmental Baseline Survey Concerning Housing at Public/Private Venture Beaufort" ("EBS").

33.    The EBS, dated September 2001, is a report prepared by experts that identifies environmental contaminants including asbestos, lead based paint, pesticides, and abandoned underground storage tanks that previously contained diesel.

34.    The EBS says efforts were made to "encapsulate" lead based paint at homes, but most of the paint is now peeling as evidenced in photographs that are attached to the EBS.

35.    The Laurel Bay housing units were built prior to 1977 and contain interior and/or exterior lead based paint throughout.

36.    According to the EBS, the family childcare center located in Laurel Bay contains extensive peeling of lead paint and lead paint chips are abundant in the soil, which poses a potential threat to the health of many children present on the property.

37.    Attached to the EBS is a Lead Survey Summary that identifies lead-based paint on major structural components at each home tested.  Additionally, it identifies lead-based paint at nine playgrounds, each with existing paint damage to their surfaces.

38.    The EBS, including the Lead Survey Summary, was delivered to Defendants and/or their predecessors in interest.

39.    However, the EBS was not to serve as, and did not constitute, a representation or warranty on the part of the Government to Defendants regarding the environmental or physical condition of the Premises.  Instead, the Ground Lease obligated Defendants to conduct their own investigation which took the form of an "Environmental Site Assessment" ("ESA") as described herein below.

40.    The Government also prepared a "UST Report" and provided it to Defendants and/or their predecessors in interest.

41.    The UST Report addressed abandoned underground storage tanks which were or are in severe disrepair and leaking remnant fuel oil in close proximity to Laurel Bay homes.

42.    The presence of deteriorating underground storage tanks ("USTs") warranted "Specified Underground Tank Obligations" under the Ground Lease that dictated each party's responsibility to remediate and/or remove the tanks.

43.    The number, location, and condition of abandoned underground storage tanks remain largely unknown per the EBS.

44.    For their part, Actus Lend Lease (the parent company to Defendant AMCC) commissioned URS Corporation to prepare a Final Phase I Environmental Site Assessment, Marine Corps Air Station, Laurel Bay, Beaufort, South Carolina, dated October 31, 2002 ("ESA").

45.    The purpose of the ESA was to assess the potential for environmental impact to the Laurel Bay due to past and current operations.

46.    Like the Government's EBS, the ESA identifies various "environmental liabilities" associated with Laurel Bay including asbestos, lead based paint, pesticides, and underground storage tanks that previously contained diesel fuel for heat production.

47.    According to the ESA, USTs were used to heat Laurel Bay homes from late 1950s through the late 1960s/early 1970s when they were abandoned.

48.    During the late 1990s, the USTs were re-discovered during utility construction activities.

49.    The DON contracted with CH2M Hill Constructors, Inc. to locate and to survey the USTs at Laurel Bay.  CH2M Hill Constructors, Inc. estimated the number of USTs present at Laurel Bay at 1,400.

50.    As of October 31, 2002, only six USTs had been removed and the DON planned only to purge the tanks of remnant fuel and fill them with sand.

51.    The ESA warns about the potential subsurface impacts associated with the release of fuel oil including "soil contamination, ground water contamination, and the potential presence of 'floating product' (immiscible phase fuel oil present in the groundwater surface)" at the majority of UST locations.

52.    The ESA identifies the historic use of potentially harmful pesticides at Laurel Bay including Chlordane which, despite being banned by the EPA in 1988, was routinely applied in Laurel Bay up to 1995.  Upon information and belief, Defendants conducted additional testing and confirmed the presence of pervasive pesticide contamination at Laurel Bay.

53.    By operation of the Ground Lease, Defendants were required to prepare a plan that sets forth procedures to mitigate or manage all risks from pesticide exposure pathways created during activities which disrupt contaminated soil such as demolition, excavation and construction.  This became known as the "Chlordane Management Plan".

54.    Like the Government's EBS, Defendants' ESA identified lead-based paint present throughout Laurel Bay, including paint on screened porches which is peeling and paint chips on the ground.

55.    By operation of the Ground Lease, Defendants were required to prepare a plan that sets forth procedures to mitigate or manage all risks from lead-based paint.  This became known as the "Lead Based Paint Management Plan" ("LBP").

56.    The ESA also warned about the conditions and defects common to Laurel Bay homes that promote mold growth.  They include faulty drains which cause moisture to "wick up" into slabs, bricks and food framing, wood studs under bedroom windows opposite unsealed cracks in exterior brickwork, and previously flooded carpet resulting from toilet overflows, condensate water drain overflow, water heater leaks and roof leaks.

57.     There is visible evidence of past standing water observed in the furnace rooms, bathrooms, and laundry connections in the kitchens of some homes on the Premises.

58.    When Defendants took control of military housing at Laurel Bay, they had actual and constructive knowledge of environmental contamination on the Premises as identified in the EBS, the ESA and other reports.

59.    Defendants then entered into several thousand leases with Class Plaintiffs for residential base housing at Laurel Bay (the "Residential Leases").

60.    Defendants had a pecuniary interest in leasing residential housing to Class Plaintiffs.

61.    Defendants made representations to Class Plaintiffs in connection with the Residential Leases.

62.    Class Plaintiffs relied on Defendants' representations in entering into the Residential Leases.

63.    Defendants systematically failed to warn Class Plaintiffs of environmental contamination such as that identified in the ESA and EBS.

64.    Defendant AMCC PM is responsible for managing Laurel Bay housing and for providing notification to residents under Residential Leases on behalf of Defendant AMCC.

65.     All notifications, statements, and representations made by Defendant AMCC PM to Laurel Bay residents were made under the within the course and scope of Defendant AMCC PM's agency with Defendant AMCC.

66.     Defendant AMCC PM drafts and controls the Community Policies and Guidelines provided to Laurel Bay residents and controls and directs virtually all representations to military families at Laurel Bay.

67.     Defendant AMCC incorporates the Community Policies and Guidelines into the Residential Leases.

68.     The Community Policies and Guidelines Defendants provided to Laurel Bay residents make no mention whatsoever that potentially harmful contaminants are present at Laurel Bay.

69.     Upon information and belief, Defendants' failure to disclose information about potentially harmful contaminants and possible health hazards was not the product of a deliberate decision by Defendants to keep this information from Class Plaintiffs.

70.     Class Plaintiffs would not have entered into the Residential Leases had Defendants disclosed material information about contaminants and possible safety and health hazards on the Premises that Defendants instead failed to disclose.

71.     Plaintiffs and the Class are former military family tenants who leased residential housing at Laurel Bay from Defendants.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

72.     Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

73.     Valid contracts in the form of Residential Leases were entered into between Class Plaintiffs and Defendants for the lease of residential housing at Laurel Bay.

74.     The Residential Leases defined military service members who sign the Residential Leases as "Residents" and spouses, children, and parents as "Occupants."

75.     Under the Residential Leases, Defendants assumed responsibility to meet the housing needs of military families at Laurel Bay; this included a duty to disclose to Residents and Occupants the existence of environmental contamination and potential health hazards of which Defendants had actual or constructive knowledge and duties under the South Carolina Residential Landlord Tenant Act (S.C. Code Ann. §§27-40-10 through 27-40-940) (the "SCRLTA") to "make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition," to "keep all common areas of the premises in a reasonably safe condition," and to "maintain in reasonably good and safe working order and condition all electrical, gas, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by" Defendants.

76.     Military service members who live with a dependent (spouse, child, or parent) are eligible to lease at Laurel Bay.

77.     Military families who live at Laurel Bay are therefore intended beneficiaries of the Residential Leases as Defendants assumed responsibility to meet the housing needs of military families.

78.     Under the terms of the Residential Leases, Class Plaintiffs agreed to pay rent equal to their BAH in exchange for safe and healthy residential housing for their families and agreed the parties' respective lease obligations and responsibilities would be construed under the SCRLTA and South Carolina common law interpreting these sections.

79.     Under the terms of the Residential Leases and applicable laws, Defendants breached the Residential Leases with Class Plaintiffs.

- 12 -

80. Specifically, Defendants failed to:

   a. Disclose to Class Plaintiffs the nature and extent of environmental hazards identified in Defendant's Environmental Site Assessment and the Government's Environmental Baseline Survey;

   b. Disclose to Class Plaintiffs the extent of hazards posed by lead-based paint as identified in the Lead Survey Summary;

   c. Disclose to Class Plaintiffs that common areas within Laurel Bay, including the daycare facility and playgrounds, were contaminated by lead-based paint and posed a potential threat to children;

   d. Disclose to Class Plaintiffs that soils beneath existing home foundations and surrounding perimeters were contaminated with pesticides including chlordane;

   e. Disclose to Class Plaintiffs the potential of high concentrations of chlordane which could impact air quality inside homes;

   f. Disclose to Class Plaintiffs that excavation, demolition and construction was planned that would disrupt contaminated soils and create a potential health risk to Plaintiffs;

   g. Warn Class Plaintiffs about hidden defects on the Premises that could substantially interfere with their safe enjoyment and use of the Premises;

   h. Comply with applicable provisions of internal policies and procedures regarding safety and habitability of housing at Laurel Bay;

- 13 -

      i.   Comply with applicable provisions of federal, state, and local laws that established a standard of care with respect to safety and habitability of housing at Laurel Bay (as set forth further herein);

      j.   Comply with applicable provisions of the SCRLTA; and

      k.   Provide safe and habitable housing to Class Plaintiffs.

81.    Class Plaintiffs sustained damages as a result of Defendants' breaches including the overpayment of rent.

82.    Because of Defendants' breaches of contract, it has been necessary for Class Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

83.    Under the terms of the Residential Leases, Class Plaintiffs are entitled as the prevailing party to recover reasonable attorneys' fees and costs in pursuing this action.

84.    As a proximate and legal result of Defendants' breaches of contract, Class Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

## SECOND CLAIM FOR RELIEF
### (Violation of the South Carolina Residential Landlord Tenant Act)

85.    Class Plaintiffs repeat and incorporate all factual allegations within the Complaint.

86.    The Residential Leases incorporate by reference the terms of the SCRLTA.

87.    Under the Residential Leases and the SCRLTA, Defendants owe a duty to Class Plaintiffs to provide safe and habitable residential housing.

88.    Specifically, South Carolina Code of Laws §27-40-220 imposes upon landlords an obligation of good faith in the performance of their obligations under residential leases.

89.     Also, South Carolina Code of Laws §27-40-440(a) obligates Defendants to supply housing that complies with all applicable building and housing laws materially affecting health and safety and to keep the Premises in a fit and habitable condition.

90.     The SCRLTA was enacted to provide for safe and habitable housing, including compliance with the requirements applicable building and housing codes materially affecting health and safety, and to promote public safety.

91.     Defendants have mandatory statutory duties to tenants under SCRLTA to do whatever is necessary to put and keep and do whatever is necessary to put and keep the premises in a fit and habitable condition.  South Carolina Code of Laws §27-40-440(a)

92.     Class Plaintiffs are tenants in leased houses subject to the provisions of SCRLTA, and a within the class of persons to be protected by application of SCRTLA.

93.     Under the terms of the Residential Leases, Class Plaintiffs agreed to pay rent in exchange for safe and habitable residential housing.

94.     Defendants breached their duty to provide safe and habitable residential housing.

95.     Despite their mandatory duties per the Residential Leases and the SCRLTA, Defendants failed to provide healthy, safe, fit, and habitable housing to Class Plaintiffs.  Instead, Defendants exposed Class Plaintiffs and their families to known environmental contamination and related health risks without their knowledge and against their will.

96.     Defendants therefore breached their duties under the Residential Leases and the SCRLTA and Class Plaintiffs are entitled to all rights and remedies afforded to tenants under the SCRLTA, which includes a recovery for their reasonable attorney's fees and costs.

97.     Because of Defendants' breaches of their duties under the Residential Leases and the SCRLTA, it has been necessary for Class Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

98.     Class Plaintiffs have sustained damages as a result of Defendants' breaches of their duties under the Residential Leases and the SCRLTA, which damages include the overpayment of rent.

99.     As a proximate and legal result of Defendants' breaches of their duties, Class Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

**THIRD CLAIM FOR RELIEF**
**(Violation of Residential Lead-Based Paint Hazard Reduction Act)**

100.    Class Plaintiffs repeat and incorporate all factual allegations contained within the Complaint.

101.    Defendants have violated applicable provisions and associated regulations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, Title X of the Housing and Community Development Act of 1992, U.S.C. §§ 4851, *et seq.*:

   a.  By failing to provide notice to Class Plaintiffs who were Residents as articulated in 42 U.S.C. § 4852d;

   b.  By failing to provide Class Plaintiffs who were Residents with any available reports or records pertaining to the presence of lead or lead-based paint hazards in the Premises;

   c.  By failing to notify Class Plaintiffs who were Residents of their right to have a 10 day period to inspect the premises for lead prior to taking possession of the Premises; and

d.  By failing to provide Class Plaintiffs who were residents with a 10 day period to inspect the Premises for lead prior to taking possession of the premises.

102.    Given their actual and constructive knowledge regarding the presence of lead-based paint at Laurel Bay, Defendants failure to provide all of the statutorily required disclosures constituted a knowing violation of 42 U.S.C. § 4852d.

103.    As a direct and proximate result of Defendants' conduct, Class Plaintiffs who were Residents sustained actual damages including, without limitation, overpayment of rent given the fact the Premises were not worth the amount Class Plaintiffs paid in rent to Defendants.

104.    Per 42 U.S.C. § 4852d(b)(3), Defendants are jointly and severally liable to Class Plaintiffs who were Residents in an amount equal to three times the amount of damages incurred by each such person.

105.    Per 42 U.S.C. § 4852d(b)(4), Defendants are jointly and severally liable to Class Plaintiffs who were Residents, as prevailing parties, the costs of this action, reasonable attorneys' fees, and any expert witness fees.

## FOURTH  CLAIM FOR RELIEF
### (Negligence)

106.    Class Plaintiffs repeat and incorporate all factual allegations contained within the Complaint.

107.    Defendants owed duties to Plaintiffs as follows:

a.  To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

- 17 -

b.   To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

c.   To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

d.   To ensure that Class Plaintiffs and their families had quality housing generally reflecting contemporary community living standards;

e.   To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

f.   To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

g.   To keep the leased premises clean, safe, and habitable;

h.   To maintain the common areas at Laurel Bay so that they are safe for use by residents;

i.   To adhere to the terms of the Ground Lease;

j.   To adhere to the terms of the Residential Leases;

k.   To comply with applicable federal, state, and local laws regarding the safety and habitability of the leased premises including, without limitation, the SCRLTA and the Residential Lead-Based Paint Hazard Reduction Act of 1992;

l.   To comply with the International Property Maintenance Code, as adopted in Beaufort as the Property Maintenance Code of the City of Beaufort ("PM

- 18 -

Code"), Code of Ordinances for Beaufort South Carolina, Section 5-1017, which imposed upon Defendants the following specific duties:

(1) To maintain buildings, structures, and premises;

(2) To refrain from "permit[ting] another person to occupy premises that are not in a sanitary and safe condition and that do not comply with the requirements of [the PM Code]."

(3) To "maintain, in a clean and sanitary condition, the shared or public areas of the structure and exterior property."

m. To exercise reasonable care for the safety of Class Plaintiffs;

n. To comply with their safety plans, safety protocols, and safety procedures that required putting residents on notice of potentially harmful conditions and related health risks they may encounter in Laurel Bay; and

o. To communicate truthful information to Class Plaintiffs about the Premises, including a duty to disclose material facts regarding the Premises of which Defendants had knowledge, as to which Class Plaintiffs lacked knowledge, of which Class Plaintiffs ought reasonably to be informed before entering into the Residential Leases, and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading.

108. Defendants breached their duties to Class Plaintiffs in one or more of the following particulars:

a. Failing to comply with and abide by, their own plans, procedures, and protocols for the safe management of environmental hazards, including those

identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

b.  Failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

c.  Leasing houses that did not meet minimum adequacy standards for health safety;

d.  Failing to ensure that Class Plaintiffs and their families had quality housing generally reflecting contemporary community living standards;

e.  Failing to undertake repairs, renovations, remediation, and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

f.  Leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

g.  Failing to keep the leased premises clean, safe, and habitable;

h.  Failing to maintain the common areas at Laurel Bay so that they are safe for use by residents;

i.  Failing to adhere to the terms of the Ground Lease;

j.  Failing to adhere to the terms of its Residential Leases;

k.  Permitting Class Plaintiffs to occupy premises that were known by Defendants to be unsanitary and unsafe;

l.  Failing to tell Class Plaintiffs that Laurel Bay housing was contaminated and that leasing property in Laurel Bay would thereby deprive them of the benefit of their lease payments and leasehold interests;

m. Failing to tell Class Plaintiffs that Laurel Bay housing was contaminated and that residing in Laurel Bay housing would result in exposure to environmental contamination;

n. Failing to communicate truthful information; and

o. Failing to communicate information that was necessary to make other information provided accurate and reliable.

109. Defendants' breaches of duties as aforesaid constitute negligence, negligence *per se*, recklessness, and gross negligence.

110. As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, it has been necessary for Class Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

111. Class Plaintiffs have directly and proximately sustained damages as a result of Defendants' negligence, which damages include the overpayment of rent.

112. As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, Class Plaintiffs are entitled to an award of all their actual and consequential damages, in amounts to be proven at time of trial.

113. Defendants' conduct was undertaken grossly negligently and with reckless disregard for the foreseeable consequences to Class Plaintiffs.

114. Defendants' conduct therefore justifies and award of exemplary or punitive damages.

**WHEREFORE,** Class Plaintiffs pray for judgment in their favor against Defendants as follows:

1. General, special, and consequential damages in an amount to be proven at trial;

2. Treble damages under the Third Claim for Relief;

3.  Reasonable attorneys, fees and costs;

4.  Punitive damages for Defendants' reckless and grossly negligent conduct; and

5.  For such other and further relief as the Court may deem just and proper.

BAUER & METRO, P.C.

BY:  /s/ SAMUEL C. BAUER
Samuel C. Bauer, Esq.
Fed. ID No. 7508
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297
sbauer@bauerandmetro.com

PETERS, MURDAUGH, PARKER,
   ELTZROTH & DETRICK, P. A.

By:  /s/ Bert G. Utsey, III
Bert G. Utsey, III, Esq.
Fed. ID No. 1045
1 Wesley Drive, Suite 1-B
Charleston, SC  29407
P.O. Box 30968 (29417)
(843) 549-9544
butsey@pmped.com

By:  /s/ Ronnie L. Crosby
Ronnie L. Crosby, Esq.
Fed. ID No. 6311
P.O. Box 457
Hampton, SC 29924
(843) 549-9544
rcrosby@pmped.com

ATTORNEYS FOR CLASS PLAINTIFFS

October 26, 2017
Hilton Head, South Carolina