IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Amanda Whatley, SSgt. Joshua Whatley, Leah Fuhrman, PO1 Randy Fuhrman, Stephany Cross, SSgt. Paul Cross, CW4 Robert Domen, Victoria Howe, GySgt. Scott Howe, Jenna Risher, Sgt. Levi Risher, On Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> Atlantic Marine Corps Communities LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Managing Member LLC, a/f/k/a Tri-Command Military Housing LLC, and Atlantic Marine Corps Communities Property Management LLC, <br><br> Defendants. | Civil Action No. 9:17-cv-02716-DCN |

**DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE TO
THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I. CONTROLLING FOURTH CIRCUIT LAW IS CLEAR THAT DERIVATIVE SOVEREIGN IMMUNITY IS A JURISDICTIONAL BAR DECIDED UNDER RULE 12(B)(1) AND WAS NOT OVERRULED BY *CAMPBELL-EWALD*. ................................ 2

II. DEFENDANTS ARE ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY BECAUSE THE DEFENDANTS WERE IN COMPLIANCE WITH FEDERAL DIRECTIONS. ......................................................................................................................... 5

III. DEFENDANTS' POSITION DOES NOT CREATE POLICY CONCERNS. ...................... 9

CONCLUSION ............................................................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*Adkisson v. Jacobs Engineering Grp., Inc.*,
 790 F.3d 641 (6th Cir. 2015) ............................................................................................. 2

*Butters v. Vance International, Inc.*,
 225 F.3d 462 (4th Cir. 2000) ............................................................................................. 2

*Campbell-Ewald Co. v. Gomez*,
 136 S. Ct. 663 (2016) ............................................................................................ 1, 2, 3, 4

*Condon v. Haley*,
 21 F. Supp. 3d 572 (D.S.C. 2014) ................................................................................. 4, 11

*Cunningham v. General Dynamics Information Technology, Inc.*,
 2017 WL 1682534 (E.D. Va. 2017) .................................................................................... 4

*F.D.I.C. v. Meyer*,
 510 U.S. 471 (1994) ........................................................................................................... 5

*Feres v. United States*,
 340 U.S. 135 (1950) ......................................................................................................... 10

*In re KBR, Inc. Burn Pit Litigation*,
 744 F.3d 326 (4th Cir. 2014) ............................................................................................. 2

*In re United States Office of Personnel Management Data Security Breach Litigation*,
 266 F. Supp. 3d 1 (D.D.C. 2017) .................................................................................... 4, 7

The United States of America ("Government") submitted a Statement of Interest arguing that Defendants, Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Managing Member, LLC, a/f/k/a Tri-Command Military Housing, LLC, and Atlantic Marine Corps Communities Property Management LLC (hereinafter "Defendants") are not entitled to derivative sovereign immunity because (i) the jurisdictional bar of sovereign immunity is not available to private parties, (ii) the facts and documents at issue make immunity inapplicable, and (iii) the immunity raises policy concerns here.

Although the Defendants are still entitled to the dismissal of the Amended Complaint sought in their motion based on the various other grounds cited in the moving papers, which are not dependent on the derivative immunity argument, the arguments raised in the Statement of Interest are incorrect on the law and the facts.

Private parties are indeed entitled to sovereign immunity. Controlling law in the Fourth Circuit is clear and well-settled that derivative sovereign immunity applies to contractors when they act in compliance with federal directions and pursuant to authority validly conferred, and that such immunity is a jurisdictional bar under Federal Rule of Civil Procedure ("Rule") 12(b)(1). *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016), which the Statement of Interest selectively quotes, did not overrule this established law in the Fourth Circuit. District court decisions following *Campbell-Ewald* directly contradict the Government's unsupported view of the law.

The underlying facts here undeniably trigger Defendants' immunity. The Statement of Interest miscasts the Navy's role in the Laurel Bay project. The Navy has and continues to exercise extensive oversight and control regarding environmental conditions at Laurel Bay and

the terms upon which AMCC leases Laurel Bay home to tenants, which confirms AMCC's actions were in compliance with federal directions.

Finally, the Government's purported policy concerns are non-existent: dismissing this case under derivative sovereign immunity raises no new policy concerns and Defendants still have a strong incentive to continue to provide service members with high quality housing.

**I.  CONTROLLING FOURTH CIRCUIT LAW IS CLEAR THAT DERIVATIVE SOVEREIGN IMMUNITY IS A JURISDICTIONAL BAR DECIDED UNDER RULE 12(B)(1) AND WAS NOT OVERRULED BY *CAMPBELL-EWALD*.**

The Government first argues derivative sovereign immunity (or *Yearsley* immunity) is not a jurisdictional bar and is at most a "defense to liability." That, however, is not the law.

As the Government recognizes in its Statement of Interest, the Fourth Circuit has explained that it is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000); *see* Government's Statement of Interest ("SOI") at 9 (citing *Butters* and *In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014)). Other federal courts of appeals have recently confirmed the Fourth Circuit has repeatedly held that *Yearlsey* immunity "is indeed jurisdictional." *Adkisson v. Jacobs Eng. Grp., Inc.*, 790 F.3d 641, 646 (6th Cir. 2015) (explaining the Fourth Circuit has "not take[n] issue with" lower courts' reviewing *Yearlsey* immunity as an argument "for lack of subject matter jurisdiction under Rule 12(b)(1)").

Faced with this controlling precedent in the Fourth Circuit, the Government incorrectly contends *Campbell-Ewald* put an end to derivative sovereign immunity and "effectively" overruled Fourth Circuit law that *Yearsley* immunity is a jurisdictional bar. (SOI at 9.) But neither the holding nor the language in *Campbell-Ewald* support the Government's claim.

2

The holding in *Campbell-Ewald* belies the Government's allegation. The *Campbell-Ewald* court held that derivative sovereign immunity did not apply to the defendant Campbell because the Navy had explicitly instructed Campbell not to do the exact acts it ultimately committed. 136 S. Ct. at 673-74 (explaining Campbell sent text messages without recipient consent even though the Navy "noted the importance of ensuring that" all "recipients had consented to receiving messages"). As the court summarized: "In short, the current record reveals no basis for arguing … that Campbell complied with the Navy's instructions." *Id.* at 674. The Government attempts to contort the holding in *Campbell-Ewald* – that Campbell lacked *Yearlsey* immunity because it did not comply with the Navy's instructions – into a far broader statement of the law the Supreme Court simply never uttered – that *Yearlsey* can never be a jurisdictional defense.

In fact, no statement in *Campbell-Ewald* overruled, let alone discussed, Fourth Circuit case law that *Yearlsey* immunity is jurisdictional. Nor did *Campbell-Ewald* ever state that the defense a private contractor can assert, even if it is a defense to liability, is not jurisdictional in nature. Ignoring this glaring lack of direct support for its position, the Government instead cites the sentence in *Campbell-Ewald* endorsing that contractors do not automatically "share the Government's unqualified immunity from liability and litigation." (SOI at 7-8) (quoting *Campbell-Ewald*, 136 S. Ct. at 672). The Government then jumps to the conclusion that *Yearlsey* is merely a defense to liability. But the Government conveniently skips over an entire paragraph in *Campbell-Ewald*, which explains:

> "[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." That immunity, however, unlike the sovereign's, is not absolute. Campbell asserts "derivative sovereign immunity," but can offer no authority for the notion that private persons performing Government work acquire the

3

> Government's embracive immunity.  **When a contractor violates both federal law and the Government's explicit instructions, as here alleged, no "derivative immunity" shields the contractor from suit by persons adversely affected by the violation.**

*Id.* at 672 (citations omitted) (emphasis added).  The Government's selective quotation and paraphrasing of *Campbell-Ewald* cannot substitute for the Supreme Court's actual words specifying derivative sovereign immunity is not available "[w]hen a contractor violates both federal law and the Government's explicit instructions." *Id.*  Simply put, *Campbell-Ewald* fails to stand for the proposition that *Yearsley* immunity, when applicable, is not jurisdictional.

Moreover, recent district court decisions contradict the Government's interpretation of *Campbell-Ewald*.  District court rulings post-dating and discussing *Campbell-Ewald* have held that *Yearsley* immunity is indeed a jurisdictional bar.  For example, in *In re U.S. Office of Personnel Management Data Security Breach Litigation*, the district court dismissed all claims against a government contractor "for lack of subject matter jurisdiction" where the plaintiffs failed to sufficiently allege that the contractor had "violated OPM's explicit instruction or exceeded its authority under its contract with the agency." 266 F. Supp. 3d 1, 5 (D.D.C. 2017); *see also Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 2017 WL 1682534, at *4 (E.D. Va. 2017) (dismissing a case with prejudice and holding it lacked jurisdiction where it analyzed the factual merits of the inquiry to determine the defendant was "entitled to derivative sovereign immunity under *Yearsley*").

In sum, *Campbell-Ewald* did not overrule Fourth Circuit law that derivative sovereign immunity is jurisdictional.  "It is axiomatic that a decision of a circuit court, not overruled by the United States Supreme Court, is controlling precedent for the district courts within the circuit." *Condon v. Haley*, 21 F. Supp. 3d 572, 583 (D.S.C. 2014) (citation omitted) (eschewing a "debate over precedent" in favor of following the "clearly stated authority of the Fourth Circuit's seminal

4

decision"). The Court should follow Fourth Circuit precedent on the issue and evaluate derivative sovereign immunity as a jurisdictional bar under Rule 12(b)(1).[1]

## II. DEFENDANTS ARE ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY BECAUSE THE DEFENDANTS WERE IN COMPLIANCE WITH FEDERAL DIRECTIONS.

The Government argues that the terms of the Ground Lease and Operating Agreement do not show Defendants derived any immunity or privilege through their relationship with the Navy. (*See* SOI at 8-10.) The nature of Laurel Bay project and the relationship between AMCC and the Navy, however, directly contradict the Government's argument in at least four ways: (1) the Navy selected the properties to be privatized; (2) the Navy negotiated the terms and conditions of the Ground Lease and Operating Agreement; (3) the Navy maintained liability for certain environmental conditions at Laurel Bay; and (4) the Navy reviewed, approved and authorized the tenant lease forms AMCC uses for Laurel Bay lessees and the environmental notice provisions contained therein.

*First*, the crux of Plaintiffs' claims in this litigation relates to environmental conditions that existed at the Laurel Bay housing that AMCC operates. The decision to privatize housing at Laurel Bay was exclusively a Government decision. The Navy issued a public Request for Proposals on December 11, 2001, that called for the inclusion of various properties into MHPI including Laurel Bay. (Exhibit 1 Hawkins Declaration, Attachment 1 at 2.) AMCC had no say whatsoever in which installations or properties the Navy chose to include in its MHPI program. The complained of environmental conditions at Laurel Bay were not caused by AMCC or any entity acting on behalf of AMCC. Rather, the alleged environmental conditions were caused by

---

[1] The Government quotes *F.D.I.C. v. Meyer*, 510 U.S. 471, 471 (1994) for the unremarkable proposition that sovereign immunity is jurisdictional and a court must evaluate a waiver of immunity as a condition to taking jurisdiction. (SOI at 6.) *Meyer* addressed whether a *Bivens* constitutional tort claim can be brought against a government agency. The case does not deal with *Yearsley* immunity and whether or not derivative immunity is jurisdictional.

5

the Government or contractors acting on the Government's behalf and existed when AMCC assumed operation of the project.

*Second*, the scope of any remediation or clean-up of environmental conditions at Laurel Bay is governed by the Ground Lease, Operating Agreement, and Guaranteed Scope of Work contained in the Design-Build Agreement, all of which the Government had an integral role in negotiating and approving as part of the privatization process.

Further, both in practice and under the terms of the written agreements between AMCC and the Navy, the Navy had day-to-day oversight into AMCC's construction including any environmental remediation and operation of the Laurel Bay project. For example, a representative of the Navy, the Resident Officer in Charge of Construction, was responsible for monitoring and inspecting project construction on behalf of the Government for assurance that safety codes and quality standards required under the Operating Agreement and the Ground Lease were complied with. (SOI, Ex. 1 ¶ 5.04 (f) at 16; Ex. 1 Hawkins Decl., Attachment 1 ¶ 13.6 at 32-33.) The Navy also has the right under the Ground Lease "to inspect the Premises for compliance with environmental, safety and occupational health laws and regulation whether or not the Government is responsible for enforcing those laws." (Ex. 1 Hawkins Decl., Attachment 1 ¶ 12.2.4 at 23.)

To the extent AMCC fails to perform its obligations under the project agreements, the project documents provide the Navy with a number of rights and remedies. For instance, the Navy has the right to direct AMCC to replace the project's Property Manager, General Manager, and Development Manager. (SOI, Ex. 1 ¶ 5.06 (b)-(d) at 23.) The Navy has neither exercised

these rights nor has notified AMCC that the notices AMCC provides to tenants about environmental conditions at Laurel Bay are deficient.[2]

To the contrary, the Navy responded to the allegations of environmental contamination at Laurel Bay directly without AMCC by, among other things, commissioning a comprehensive Public Health Review,[3] removing underground storage tanks,[4] engaging in extensive monitoring and sampling at Laurel Bay,[5] holding multiple town-hall meetings for residents, and creating a website dedicated to the allegations.[6] These actions undercut the Government's argument that AMCC was not acting within the scope of its agreement with the Navy in providing housing to Laurel Bay residents. The direct opposite is true because, as is shown below, responsibility for existing environmental conditions at Laurel Bay remains primarily with the Navy.

*Third*, the Ground Lease between the Navy and AMCC placed most risks associated with existing environmental conditions at Laurel Bay on the Navy and not AMCC. According to the

---

[2] The Navy's conduct here is akin to the situation in *In re U.S. Office of Personnel Management Data Security Breach Litigation*, where, in finding the contractor entitled to *Yearsley* immunity, the court observed the government did not disavow the contractor's actions. 266 F. Supp. 3d at 50.

[3] *Public Health Review Report*, NAVY AND MARINE CORPS PUBLIC HEALTH CENTER (September 29, 2017), http://www.beaufort.marines.mil/Portals/53/Docs/Soil/Final%20MCAS%20Beaufort%20Public%20Health%20Review%20Report%20%20NMCPHC%2029%20September%202017.pdf?ver=2017-10-03-160938-760.pdf.

[4] *Fact Sheet, Soil Gas Sampling, Laurel Bay Military Housing Area*, MARINE CORPS AIR STATION BEAUFORT (March 2016), http://www.beaufort.marines.mil/Portals/53/Site%20Images/FRONTPAGEIMAGES/DOCUMENTS/LB_Fact%20Sheet_Residential_Community%20.pdf.

[5] *Laurel Bay Questions and Answers*, MARINE CORPS AIR STATION BEAUFORT, http://www.beaufort.marines.mil/Portals/53/Docs/PAO/Laurel-Bay/Q%20and%20As.pdf (last visited March 8, 2018).

[6] *Laurel Bay Health Study*, MARINE CORPS AIR STATION BEAUFORT, http://www.beaufort.marines.mil/Resources/Laurel-Bay-Health-Study/ (last updated January 11, 2018).

7

Article 12 of the Ground Lease, AMCC did not assume liability or responsibility for existing contamination:

> [AMCC] does not assume any liability or responsibility for environmental remediation, impacts and damage caused by the presence of toxic or Hazardous Waste: substances or materials in, on or under any portion of the Installation . . . and has no obligation under this Lease to undertake the defense of any claim or action, whether in existence now or brought in the future, alleging environmental impacts and damage arising out of the presence of or release of any toxic or Hazardous Waste, substances, or materials in, on, under or from any part of the Installation . . . . (Ex. 1 Hawkins Decl., Attachment 1 ¶ 12.1 at 21.)

Rather, the Navy retained that environmental liability:

> Except as expressly set forth in this Article 12 or specifically included in the Scope of Work the Government shall retain liability for damages for exposure, contamination or release and responsibility for remediation which is caused by or arises from the presence of any toxic or Hazardous Waste, substances or materials in, on or under the Premises on or prior to the Term Beginning Date. (*Id.*)

While the Ground Lease required AMCC manage certain contaminants in existing homes through Navy-approved plans, AMCC's obligations to undertake any remediation activities for such contaminants were subject to specified Navy-imposed conditions, including the availability of funds in relevant project-related accounts. (*Id.* ¶ 12.5 at 30-31.) For some environmental conditions, such as underground storage tanks, all associated liability and responsibility remained with the Navy:

> The Government and the Lessee acknowledge that home heating oil underground tanks are located on the Premises . . . The Lessee shall have no obligations or liabilities pursuant to Environmental Laws or otherwise with respect to the Underground Tanks or any soil or groundwater condition relating to or arising from the presence or former presence of any Underground Tanks, in each case except to the extent set forth in: (a) the Scope of Work or (b) a separate, express written agreement of the Parties . . . . (*Id.* ¶ 12.4 at 30.)

*Fourth*, the Navy reviewed, authorized and approved the form tenant lease agreements, including all of the notices of environmental conditions, AMCC entered into with all Laurel Bay residents. As part of the negotiation and closing of Tri-Command Military Housing project (later renamed AMCC), AMCC's predecessor was required by the Navy to include a tenant Lease Agreement form among the various project-related documents. (Ex. 1 Hawkins Decl., Attachment 2.) The form tenant Lease Agreements included, among other things, a "Resident Guide and Community Standards," which enclosure a "Lead Paint Brochure/Disclosure" and a "Hazards of Asbestos." (Ex. 1 Hawkins Decl., Attachment 3.) The "Operating, Management, and Maintenance Plan" for the AMCC Project required any changes to the form Lease Agreements to be approved by the Navy prior to implementation. (Ex. 1 Hawkins Decl. ¶ 8.) The Lease Agreement AMCC has used for Laurel Bay lessees has been changed periodically since AMCC began operating the project. AMCC sought and obtained Navy approval for revisions to the tenant Lease Agreement form, which the Navy expressly authorized. (Ex. 1 Hawkins Decl. ¶ 9.) These revised, Navy-approved Lease Agreements which many of the named-Plaintiffs signed, contain a "Mold and Mildew Addendum," "Asbestos Disclosure," and a "Lead Based Paint Hazards Disclosure." (Ex. 1 Hawkins Decl., Attachment 4.)

The contention that Defendants cannot show that the actions complained of in the Amended Complaint were authorized by the Government is directly contradicted by the express terms of the agreements between AMCC and the Navy and the Navy's response when allegations of adverse conditions at Laurel Bay became public.

## III. DEFENDANTS' POSITION DOES NOT CREATE POLICY CONCERNS.

The Statement of Interest contends Defendants' position "creates" "problems" for services members who would be left with "no recourse" and Defendants would have "little

9

incentive to provide quality housing." (SOI at 10-11.) This claim is both unfounded and irrelevant.

Military families routinely have limitations on their ability to recover for injuries, including against the Government. *See, e.g.*, *Feres v. U.S.*, 340 U.S. 135, 146 (1950) (holding service members were barred from bringing claims against the government for injuries incident to their military service). The Government provided detailed background on the MHPI initiative. (SOI at 2-4). But nowhere does the Government suggest the MHPI initiative was created for the purpose of opening up new avenues of lawsuits for military family members where they otherwise would have been limited or precluded from doing so. Thus, Defendants' position, which has been endorsed by the Fourth Circuit, does not "create" new problems for service members; it merely applies the law of the land.

Applying *Yearsely* immunity in this context advances the Government's interest in providing high-quality housing for service members through MHPI. As discussed in the Government's Statement of Interest, the purpose of the MHPI was to "'substantially upgrade military housing on an accelerated basis.'" (SOI at 2.) One of the MHPI authorities the Navy used for the AMCC Project was participating directly in the limited liability company established for the project as an equity member in AMCC. (SOI, Ex. 1 § 3.02 at 5.) As shown above in Section II, the Navy's role in AMCC also provides it with substantial oversight and decision-making rights over the management and operation of AMCC. The application of *Yearsely* immunity here allows the Navy to protect its financial investment in the Project while ensuring Defendants remain accountable for providing high-quality housing and service to the Project's residents.

Similarly, Defendants still have a strong incentive to provide high-quality housing to service members. Service members assigned to MCAS Beaufort are not required to live in AMCC's homes. Rather, AMCC competes for tenants in the local housing market. If AMCC fails to provide attractive housing and competitive service, service members will choose live elsewhere and AMCC's occupancy rates and revenues decline. Defendants have strong financial incentive to maximize occupancy by attracting and retaining as many tenants as possible.

Moreover, the Government undermines its own argument that service members would never have recourse and that Defendants would receive "more immunity than would be available to the Government." (SOI at 11). The Government admits some statutes provide "carefully-constructed waivers" of the Government's sovereign immunity in certain situations. (*Id.*) Thus, if there was an effective waiver of the Government's sovereign immunity, service members would seemingly be entitled to those waivers in claims against government contractors, by its very derivative nature.[7]

Finally, the Court cannot disregard controlling precedent, even based on the Government's purported policy concerns. *See supra Condon*, 21 F. Supp. 3d at 583. The Government cites no case law or authority to the contrary.

## **CONCLUSION**

For all these reasons, the Court should hold Defendants are entitled to derivative sovereign immunity, the Statement of Interest arguments are unavailing, and the Complaint should be dismissed.

---

[7] Neither Plaintiffs nor the Government has explained how any statute specifically waives Defendants' derivative sovereign immunity here.

Respectfully submitted,

ROSEN, ROSEN & HAGOOD, LLC

By: s/James A. Bruorton, IV
    James A. Bruorton, IV
    Federal I.D. No. 9302
    Brewton Hagood
    Federal I.D. No. 1658
    Liam D. Duffy
    Federal I.D. No. 12249
    151 Meeting Street, Suite 400
    P.O. Box 893 Charleston, SC 29402
    (843) 577-6726
    bhagood@rrhlawfirm.com
    rhlawfirm.com
    lduffy@rrhlawfirm.com

AND

    Hal J. Perloff, Esquire
    Husch Blackwell, LLP
    750 17th St., NW, Suite 900
    Washington, D.C. 20006-4675
    U.S. District Court for the District of
    Columbia (Bar ID: 461716)
    U.S. District Court for the Northern
    District of Illinois (Bar ID: 6225835)
    Hal.Perloff@huschblackwell.com
    *Admitted Pro Hac Vice*

    Michael Klebanov, Esquire
    Husch Blackwell, LLP
    750 17th St., NW, Suite 900
    Washington, D.C. 20006-4675
    U.S. District Court for the Eastern
    District of Missouri (Bar ID: 66540)
    Michael.Klebanov@huschblackwell.com
    *Admitted Pro Hac Vice*

    **ATTORNEYS FOR DEFENDANTS**

Dated: March 9, 2018